UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LOUIS COVIELLO, | : | CIVIL NO: 1:15-CV-01812 |
| | : | |
| Plaintiff | : | (Judge Kane) |
| | : | |
| v. | : | (Chief Magistrate Judge Schwab) |
| | : | |
| THE BERKLEY PUBLISHING | : | |
| GROUP, *et al.,* | : | |
| | : | |
| Defendants | : | |
| | : | |

## REPORT AND RECOMMENDATION

### I.  Introduction.

The plaintiff, Louis Coviello, contends that the defendants, who are the author and publisher of a book, defamed him, committed various state-law torts, and violated his constitutional rights.  Currently pending is the defendants' motion to dismiss or for summary judgment.  For the reasons that follow, we recommend that that motion be granted.

### II.  Background and Procedural History.

Coviello, a prisoner at the State Correctional Institution at Huntingdon, began this case in September of 2015.  In March of 2016, he filed an amended complaint naming four defendants: (1) Penguin Random House, LLC ("Penguin

Random House"); (2) the Berkley Publishing Group ("Berkley"); (3) Penguin Group (USA) ("Penguin Group"); and (4) Matt Birkbeck ("Birkbeck").  Coviello's claims center on a book—*The Quiet Don: The Untold Story of Mafia Kingpin Russell Bufalino*—written by Birkbeck and published by the other defendants.

Coviello alleges that Birkbeck met with members of the Pennsylvania Gaming Board's Bureau of Investigations and Enforcement ("BIE"), Pennsylvania State Police Trooper Rich Weinstock, Trooper Dave Schwartz, and Deputy Commissioner Ralph Periandi, all of whom provided Birkbeck with information about Coviello that Birkbeck used in writing the book.  According to Coviello, Birkbeck falsely stated in the book that on several occasions, Weinstock and Swartz visited Coviello at the State Correctional Institution at Frackville, and during those visits, Coviello detailed his long relationship with DeNaples and DeNaples's family and his bitterness over DeNaples abandoning him after his convictions.  In the book, Birkbeck wrote: "'He (DeNaples) told me and my father he would take care of this.  That I wouldn't go to prison.  He knew I didn't shoot anyone, but at the trial they said I was the one with the gun.  They let me sink,' Coviello told the troopers." *Doc. 30* at ¶14.

According to Coviello, this statement was false and was deliberately placed in the book to portray him as a police informant and witness against DeNaples, who is reputed to be a member of the mafia crime family of Russell Bufalino, and

2

it was placed in the book for the purpose of endangering his life and safety in prison. Coviello alleges that Weinstock, Swartz, and others knew or should have known that to identify him in the book as a police informant and witness against DeNaples would place him in danger of assault, injury, and death at the hands of other prisoners. According to Coviello, Birkbeck conspired with Weinstock, Swartz, and other members of the Pennsylvania State Police to include false information in the book about him.

Weinstock, Swartz, and others also gave Birkbeck letters that they claimed to have received from Coviello containing incriminating information about DeNaples. According to Coviello, those letters were "false, forged and fraudulent," and the State Troopers who gave them to Birkbeck affixed Coviello's name and inmate number to the letters in an attempt to make them appear authentic. *Id*. at ¶15. These letters were intentionally included in the book to endanger Coviello's safety, and they placed him in "great, immediate and unnecessary danger." *Id*.

Coviello also alleges that Birkbeck conspired and agreed with Weinstock, Swartz, agents of the BIE, and others to portray him as an informant and witness against DeNaples in an investigation by BIE of DeNaples in connection with DeNaples's application for a gaming license. In the book, Birkbeck wrote:

> BIE's interest came a year earlier during its background
> check as DeNaples sought a gaming license. Coviello was of

3

> such importance to BIE that during DeNaples' closed-door
> suitability hearings in December 2006, BIE had Coviello on the
> phone from prison to help them sort out DeNaples' vague
> responses.  When confronted about particular details about his
> past, DeNaples became angry and displayed a side not even his
> attorneys wanted to see.  And he had no idea BIE was getting
> its information in real time from Coviello.

*Id*. at ¶16.  Again, according to Coviello, this statement was false, was a result of

the conspiracy between Birkbeck, BIE, and the Pennsylvania State Police, and was

included in the book to place him in danger.

Birkbeck also included in the book allegedly false information describing

Coviello as a witness for the FBI and Secret Service in their investigation of a

money-laundering scheme by DeNaples.  The Book provides:

> Coviello had come to the attention of the FBI, U.S.
> Secret Service, the Gaming Board's Bureau of Investigations
> and Enforcement (BIE) and State Police Troopers Rich
> Weinstock and Dave Swartz around the same time.
> The Secret Service and FBI visited with Coviello twice in
> 2007 to talk about a money-laundering probe involving
> DeNaples.  BIE's interest came a year earlier during its
> background check as DeNaples sought a gaming license.

*Id*. at ¶17.  Once again, Coviello alleges that this false statement was the result of a

conspiracy and was designed to cause him physical and mental harm.  According

to Coviello, in addition to conspiring with the State Police Troopers, Birkbeck

acted as their agent in identifying him as an informant and witness against

DeNaples.

4

Coviello alleges that, in furtherance of a conspiracy and in an attempt to prevent him from ever being granted a commutation of his sentence or clemency, Weinstock and Swartz falsely told Birkbeck that Coviello had confessed to them that he had murdered a hospital patient.  Birkbeck wrote in the book:

> Coviello told how he had walked into Community Medical Center in Scranton and into the room of a man who was recuperating from a heart attack.  The man was a witness in an upcoming trial of Bufalino associate Philip "Fibber" Forgione, and when Coviello walked into the room, he closed the door, took a pillow, and placed it over his head, smothering him to death.
> The papers said the man died of heart failure, and neither Coviello nor Forgione were ever implicated in the murder.

*Id*. at ¶21.  Coviello contends that there was no such murder and that he never confessed to such.  According to Coviello, because of this statement in the book, it has been, or will be, entered into his prison records that he confessed to murder, and such will be used to deny him a commutation of his sentence, clemency, or parole.

Coviello contends that Birkbeck knew that what he wrote would place him in danger from other prisoners, and because of the book, Coviello is in constant danger of being assaulted or killed by other prisoners who hate informants or who hope to be monetarily rewarded by organized crime figures for carrying out a hit on him.  After the book began to circulate at SCI-Huntingdon in early September of 2015, Coviello was ostracized and shunned by other prisoners, and he is the

target of ridicule, hatred, and contempt with other prisons cursing at him, spitting

at him, threatening him with death, and calling him a "rat," "snitch," "traitor," and

"informer." *Id.* at ¶28.  He fears being violently attacked and murdered.  In fact,

Coviello was attacked in the prison yard by an unknown prisoner, who came at him

from behind and slashed his neck and throat with a sharpened instrument.

According to Coviello, the prisoner shouted: "Payback for the Book!" and then

escaped into the crowd of prisoners in the yard. *Id.* at ¶23.  Coviello suffered a

laceration to his neck and throat, both physical and mental pain, and he now lives

in constant fear and is constantly alert for threats to his life.  He suffers from

insomnia, nightmares, and nervous breakdown, and he is under psychiatric

supervision and takes Prozac.

Further, after Coviello was attacked, he was placed in the Restricted

Housing Unit for three months for an "investigation." *Id.* at ¶31.  During that time,

he was subjected to punitive conditions including limits on his outdoor exercise,

showers, recreation, and he was required to be stripped searched and have his

hands cuffed behind his back whenever he left his cell, which generally was only

for one hour every five days for an hour of outdoor recreation in a dog-kennel type

cage. *Id.* at ¶31.

According to Coviello, Birkbeck was "grossly and recklessly negligent" in

failing to fact check the false information provided to him by the State Police and

the BIE. *Id*. at ¶25.  Coviello also alleges that Penguin Random House and Berkley conspired with each other and with Birkbeck to print, publish, and distribute the book without fact checking the statements in the book about him.  He contends that they too were "grossly negligence and recklessly negligent." *Id*. at ¶26.  According to Coviello, the Penguin Group was also "grossly negligent" by failing to fact check the statements about him. *Id*. at ¶27.  He also alleges that Penguin Random House, Berkley, and the Penguin Group conspired with Birkbeck, the State Police, and the BIE to print, publish, and distribute the book knowing that it contained false statements that would place his life in danger.  Coviello further alleges that Birkbeck was "grossly" negligent by not contacting him while writing the book to give him an opportunity to respond to the accusations by law enforcement officers and by not notifying him that the book identified him as having confessed to murdering the hospital patient. *Id*. at ¶¶32 & 33.

Coviello contends that the defendants "secretly and deliberately conspired and agreed to keep the writing, publication and distribution of the book concealed from [him], by not notifying him of the writing, publication and distribution of the book, and by not giving him opportunity to comment on, respond to, clarify, explain, or correct the false statements" about him. *Id*. at ¶36.  According to Coviello, the defendants did this to prevent him from initiating legal action to prevent the publication of the book and to prevent him from filing legal action

against them "contemporaneously with the publication and distribution of the book." *Id*.  Coviello also alleges that by doing so, they endangered his life.

Coviello alleges that he attached as an exhibit to his amended complaint, a copy of pages 180 through 189 of the book, which contains the information about him, as well a copy of the cover and copyright pages of the book. *See Doc. 30* at ¶41.  Although those documents were not actually docketed as an exhibit to Coviello's amended complaint, Coviello submitted them in connection with his motion for leave to amend, *see doc. 26-3*, and because he clearly intended for them to be exhibits to his amended complaint, we will treat them as such.

Although not set forth in separate counts, the amended complaint raises both state and federal claims.  Coviello claims that the defendants' actions amounted to cruel and unusual punishment and denied him due process and equal protection of the law.  He also claims that the defendants defamed him and as a result, he suffered embarrassment and humiliation; damage to his reputation; pain and suffering due to insult to his nervous system; mental anguish and distress; and fear, terror, and constant apprehension of being assaulted, injured, and murdered by those who have read or have heard through the prison grapevine of the defamatory statements about him in the book.  He alleges that the defendants published their false statements about him to the general public and to prisoners in the Pennsylvania prison system, including Richard Mayberry, who bought the book

8

from Amazon.com.  He also claims that the defendants invaded his privacy by

unreasonably intruding upon his seclusion, by appropriating his name and using it

for their pecuniary gain, by giving unreasonable publicity to his private life, and by

unreasonably placing him in a false light.  As a result, he was subject to public

humiliation and extreme mental distress.  He further claims that the defendants'

actions were extreme and outrageous and amounted to the intentional infliction of

emotional distress.  Finally, he claims that the defendants were "grossly negligent."

*Id*. at ¶46.  He is seeking compensatory and punitive damages.

On March 30, 2016, the defendants filed a motion to dismiss the amended

complaint or, in the alternative, for summary judgment.  They contend that

Coviello's claims are barred by the statute of limitations and that the amended

complaint fails to state any claims upon which relief may be granted. *See Doc. 55*.[1]

They filed a statement of material facts setting forth two statements of fact that are

material to their statute-of-limitations argument: (1) that they published the book

on October 1, 2013; and (2) that "[t]he book was distributed and publicized in

---

[1]  Document 55 is the defendants' amended brief.  Coviello moved to strike the
defendants' original brief because that brief did not contain sections outlining the
procedural history of the case or a statement of the questions involved as required
by Local Rule 7.8(a).  In response, the defendants submitted a proposed amended
brief containing those sections.  We denied Coviello's motion to strike, but we
directed the Clerk of Court to docket the defendants' proposed amended brief as
the defendants' amended brief.

Pennsylvania, and nationwide, beginning in October 2013." *See Doc. 33-1* at ¶¶2

& 3.[2]  In support of those statements, they submitted:

> • the same excerpts and cover pages from the book that Coviello submitted as an exhibit to his amended complaint;
> • a copy of U.S. Copyright Office Public Catalog record listing the "Date of Publication" of the book as "2013-10-01;"
> • several online news articles mentioning the publication of the book (dated between September 3, 2013, and October 7, 2013);
> • a declaration from Rick Nayer stating that the book was first published in paperback in October of 2013; that the book was initially released in paperback and e-book form; and that no subsequent editions have been published; and
> • a declaration from Gayle C. Sproul, counsel for the defendants, who asserts that the documents attached to the motion are true and correct copies of what they purport to be.

*See Docs. 33-2* to *33-7*.

Because it did not seem likely that the limited facts set forth by the

defendants regarding the publication date of the book and the publicity of the

publication of the book would reasonably be in dispute, we granted the defendants'

motion to stay discovery.  Coviello appealed our order staying discovery, but

Judge Kane denied that appeal.

Coviello also filed a motion to stay the defendants' motion to dismiss or, in

the alternative, for summary judgment on the basis that he needs to conduct

_____

[2]  The defendants' statement of material facts actually contains two paragraphs numbered "3."  *See Doc. 33-1*.  The relevant paragraph is the first one numbered "3."  Hereafter, we will refer to that paragraph as ¶3(a).

10

discovery to oppose the motion.  By an Order dated May 3, 2016, we denied that

motion, but we directed Coviello to Fed.R.Civ.P. 56(d):

> It appears that the only factual issues raised by the defendants'
> motion is the date the book at issue was published and the fact
> that the publication of the book was mentioned in certain news
> articles.  If Coviello truly disputes those facts and needs
> discovery to do so, he may file an affidavit or declaration
> pursuant to Fed.R.Civ.P. 56(d), which provides that if a party
> "shows by affidavit or declaration that, for specified reasons, it
> cannot present facts essential to justify its opposition, the court
> may" defer ruling on the motion for summary judgment, deny
> the motion for summary judgment, allow time to obtain
> affidavits or declarations or to take discovery, or enter any other
> appropriate order.  District courts usually grant properly filed
> requests under Fed.R.Civ.P. 56(d) as a matter of course. *Shelton
> v. Bledsoe*, 775 F.3d 554, 568 (3d Cir. 2015).  "An adequate
> affidavit or declaration specifies 'what particular information . .
> . is sought; how, if disclosed, it would preclude summary
> judgment; and why it has not been previously obtained.'" *Id*. at
> 568 (quoting *Dowling v. City of Philadelphia*, 855 F.2d 136,
> 140 (3d Cir. 1988)).  If Coviello files a Rule 56(d) affidavit or
> declaration, in addition to setting forth the above, he shall set
> forth how long he needs to obtain such information.

*Doc. 54* at 1-2 (footnote omitted).

On June 9, 2016, Coviello filed a brief in opposition to the defendants'

motion to dismiss or, in the alternative, for summary judgment.  He submitted his

own declaration, which includes factual statements regarding the merits of his

claims as well as statements regarding his difficulty as a prisoner in accessing the

internet and the news media and his statement that the book was not in the library

at SCI-Huntingdon. *See Doc. 71-1* at 2-13.  He also submitted a declaration from

Inmate Richard Mayberry, who sets forth his familiarity with the books in the SCI-Huntingdon library and asserts that he first became aware of the book in September of 2015, when a prisoner brought the book into SCI-Huntingdon from another prison. *See Doc. 71-1* at 15. Mayberry also sets forth what happened after the inmates at SCI-Huntingdon became aware of the book. *Id*.

On June 23, 2016, the defendants filed a reply brief, and they attached a declaration from Birkbeck to that brief. Birkbeck states that the book was published in print and e-book format in October of 2013, and that it was sold in retail stores nationwide and online, such as through Amazon.com. *See Doc. 76-1* at ¶2. Birkbeck also states that before the book was published, he gave numerous interviews promoting the book, and he attaches an article, published in August of 2013, in the *Times Leader* about the book. *Id*. at ¶3 and *Doc. 76-1* at 4-6. Birkbeck further states that after the book was published, he attended a number of book signings in Pennsylvania, and he includes the locations and dates (from October 12, 2013 to April 27, 2014) of those signings. *Doc. 76-1* at ¶¶4-5. He states that one of those signings was at a Barnes & Noble store in Wilkes-Barre and drew approximately 200 people; during that event, he saw people purchasing the book, and he signed numerous copies of the book. *Id*. at ¶4. He attached a copy of an article from the *Times Leader* regarding that book signing. *Doc. 76-1* at 8-9.

12

In the meantime, Coviello filed a motion pursuant to Fed.R.Civ.P. 56(d) contending that defendants' motion for summary judgment should be continued to allow him to conduct discovery.  By an Order dated November 18, 2016, we granted in part and denied in part Coviello's Rule 56(d) motion, and we ordered the defendants to provide limited discovery to Coviello relevant to the date the book was first published, how many copies of the book were sold, and how the book was publicized in Pennsylvania.  We also granted Coviello leave to file a surreply brief and a supplemental response to the defendants' statement of material facts on or before December 29, 2016.  Upon request of Coviello, we extended that deadline until January 12, 2017.  Although Coviello recently requested another extension of time to file his sur-reply brief, we denied that motion, and Coviello has not filed a timely sur-reply brief.

## III. Discussion.

Coviello raises both federal and state claims.  We first address the federal claims under the motion-to-dismiss standard.  Because the defendants contend that the statute of limitations bars Coviello's state law claims and they have presented evidence outside the pleadings to support that contention, we review the state law claims under the summary-judgment standard.

13

### A.  Federal Claims.

### 1.  Motion to Dismiss and Pleading Standards.

In accordance with Fed.R.Civ.P. 12(b)(6), the court may dismiss a complaint

for "failure to state a claim upon which relief can be granted."  When reviewing a

motion to dismiss, "[w]e must accept all factual allegations in the complaint as

true, construe the complaint in the light favorable to the plaintiff, and ultimately

determine whether plaintiff may be entitled to relief under any reasonable reading

of the complaint." *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010).  In

making that determination, we "consider only the complaint, exhibits attached to

the complaint, matters of public record, as well as undisputedly authentic

documents if the [plaintiff's] claims are based upon these documents." *Id.* at 230.

"A Rule 12(b)(6) motion tests the sufficiency of the complaint against the

pleading requirements of Rule 8(a)." *I.H. ex rel. D.S. v. Cumberland Valley Sch.*

*Dist.*, 842 F. Supp. 2d 762, 769-70 (M.D. Pa. 2012).  "Under Federal Rule of Civil

Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the

claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal,* 556 U.S.

662, 677-78 (2009).  The statement required by Rule 8(a)(2) must give the

defendant fair notice of what the plaintiff's claim is and of the grounds upon which

it rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).  Detailed factual allegations

are not required, but more is required than labels, conclusions, and a formulaic

recitation of the elements of a cause of action. *Bell Atlantic Corp. v. Twombly*, 550

U.S. 544, 555 (2007).  "In other words, a complaint must do more than allege the

plaintiff's entitlement to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211

(3d Cir. 2009).  "A complaint has to "show" such an entitlement with its facts." *Id.*

In considering whether a complaint fails to state a claim upon which relief

can be granted, the court must accept as true all well-pleaded factual allegations in

the complaint, and all reasonable inferences that can be drawn from the complaint

must be construed in the light most favorable to the plaintiff. *Jordan v. Fox

Rothschild, O'Brien & Frankel, Inc.,* 20 F.3d 1250, 1261 (3d Cir. 1994).  But a

court "need not credit a complaint's bald assertions or legal conclusions when

deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902,

906 (3d Cir. 1997).  Additionally, a court need not "assume that a . . . plaintiff can

prove facts that the . . . plaintiff has not alleged." *Associated Gen. Contractors of

Cal. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983).

Following *Twombly* and *Iqbal,* a well-pleaded complaint must contain more

than mere legal labels and conclusions.  Rather, it must recite factual allegations

sufficient to raise the plaintiff's claimed right to relief beyond the level of mere

speculation.  In practice, consideration of the legal sufficiency of a complaint

entails a three-step analysis:

> First, the court must 'tak[e] note of the elements a plaintiff must
> plead to state a claim.' Second, the court should identify

> allegations that, 'because they are no more than conclusions,
> are not entitled to the assumption of truth.'  Finally, 'where
> there are well-pleaded factual allegations, a court should
> assume their veracity and then determine whether they
> plausibly give rise to an entitlement for relief.'

*Santiago v. Warminster Tp.,* 629 F.3d 121, 130 (3d Cir. 2010) (quoting *Iqbal,* 556

U.S. at 675 & 679).

A complaint filed by a *pro se* litigant is to be liberally construed and

"'however inartfully pleaded, must be held to less stringent standards than formal

pleadings drafted by lawyers.'" *Erickson,* 551 U.S. at 94 (quoting *Estelle v.*

*Gamble,* 429 U.S. 97, 106 (1976)).  Nevertheless, "pro se litigants still must allege

sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina,*

*Inc.*, 704 F.3d 239, 245 (3d Cir. 2013).  Thus, a well-pleaded complaint must

contain more than mere legal labels and conclusions.  Rather, a *pro se* complaint

must recite factual allegations that are sufficient to raise the plaintiff's claimed

right to relief beyond the level of mere speculation, set forth in a "short and plain"

statement of a cause of action.

### 2.  The Amended Complaint Fails to State Any Federal Claims Upon Which Relief Can Be Granted.

Coviello's federal constitutional claims are claims under 42 U.S.C. § 1983.

"Section 1983 imposes civil liability upon any person who, acting under the color

of state law, deprives another individual of any rights, privileges, or immunities

secured by the Constitution or laws of the United States." *Shuman v. Penn Manor School Dist.,* 422 F.3d 141, 146 (3d Cir. 2005).  Section 1983 "does not create any new substantive rights but instead provides a remedy for the violation of a federal constitutional or statutory right." *Id.*  To establish a claim under§ 1983, the plaintiff must establish a deprivation of a federally protected right and that this deprivation was committed by a person acting under color of state law. *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005).  The requirement that a defendant act under color of state law is essential in order to establish a claim under § 1983. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970).

"Action under color of state law 'requires that one liable under§ 1983 have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Harvey v. Plains Twp. Police Dept.*, 635 F.3d 606, 609 (3d Cir. 2011) (quoting *Abbott v. Latshaw,* 164 F.3d 141, 146 (3d Cir.1998)).  The Supreme Court has established a number of approaches to the question of when a private person acts under color of state law. *Crissman v. Dover Downs Entertainment, Inc.*, 289 F.3d 231, 239 (3d Cir. 2002). The United States Court of Appeals for the Third Circuit has "outlined three broad tests generated by Supreme Court jurisprudence to determine whether state action exists: (1) 'whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state'; (2) 'whether the private party has acted with the

help of or in concert with state officials'; and (3) whether 'the [s]tate has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity.'" *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995)).  "The inquiry is fact-specific," *Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995), and "state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior may be fairly treated as that of the State itself.'" *Brentwood Academy v. Tennessee Secondary School Athletic Assoc.,* 531 U.S. 288, 295 (2001) (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351 (1974)).

Here, Coviello contends that the defendants conspired with each other and with the state police officers.  Although an otherwise private actor may act under color of state law when engaged in a conspiracy with a state official, *see Tower v. Glover*, 467 U.S. 914, 920 (1984), Coviello has not alleged facts leading to a reasonable inference of such a conspiracy.

"[C]onspiracy under § 1983 is not an independent cause of action, but a means to impute liability on third persons." *Ober v. Miller*, No. CIV.A. 1:04-CV-1669, 2007 WL 4443256, at *18 (M.D. Pa. Dec. 18, 2007), *aff'd*, 395 F. App'x 849 (3d Cir. 2010); *see also Landrigan v. City of Warwick,* 628 F.2d 736, 742 (1st

Cir.1980) (stating that a § 1983 "[c]onspiracy is merely a mechanism by which to obtain the necessary state action, or to impose liability on one defendant for the acts of the others performed in pursuance of the conspiracy"(citations omitted)). "[A] §1983 conspiracy claim only arises when there has been an actual deprivation of a right." *Perano v. Twp. of Tilden,* 423 F. App'x 234, 239 (3d Cir. 2011).

"The essence of a conspiracy is an agreement." *United States v. Kelly,* 892 F.2d 255, 258 (3d Cir. 1989). "To demonstrate the existence of a conspiracy under § 1983, 'a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right under color of law.'" *LeBlanc v. Stedman*, 483 F. App'x 666, 670 (3d Cir. 2012) (quoting *Parkway Garage, Inc. v. City of Phila.,* 5 F.3d 685, 700 (3d Cir.1993), *abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington,* 316 F.3d 392 (3d Cir. 2003)). "It is not enough that the end result of the parties' independent conduct caused the plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism." *Perez v. Gamez*, 1:13-CV-1552, 2013 WL 6073877, at *9 (M.D. Pa. Nov. 18, 2013). Rather, the plaintiff must show that the defendants acted in concert with the specific intent to violate the plaintiff's rights. *Davis v. Fox*, 3:12-CV-1660, 2013 WL 5656125, at * 5 (M.D. Pa. Oct. 15, 2013).

Because direct evidence of a conspiracy is rarely available, the existence of a conspiracy may be inferred from the circumstances. *Capogrosso v. The Supreme*

*Court of New Jersey*, 588 F.3d 180, 184 (3d Cir. 2009).  Still, to state a conspiracy claim upon which relief can be granted, a plaintiff must allege "facts from which a conspiratorial agreement can be inferred." *Great Western Mining & Mineral Co. v. Fox Rothschild LLP,* 615 F.3d 159, 178 (3d Cir. 2010).  "To properly plead such an agreement, 'a bare assertion of conspiracy will not suffice.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

Coviello alleges that the defendants conspired with each other and with the state officers, but he does not allege facts from which a reasonable inference of an agreement among the defendants to violate Coviello's rights can be inferred.  His allegations are conclusory.  While Coviello alleges that the state officers provided false information and fraudulent letters to Birkbeck, he does not allege facts from which it can reasonably be inferred that Birkbeck, or any of the other defendants, knew that the information the state officers provided was false.  Moreover, even assuming that the defendants knew that the information was false, Coviello has not alleged facts from which it can reasonably be inferred that there was an agreement between the defendants and the officers to violate Coviello's rights.  Thus, Coviello has not alleged facts from which it can reasonably inferred that the defendants conspired with state actors, and so his §1983 claims fail to state a claim upon which relief can be granted.

### B.  State Law Claims.

#### 1.  Summary Judgment Standards.

The defendants move for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011) (quoting Fed.R.Civ.P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party

must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed.R.Civ.P. 56(c).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322.  Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248.  A dispute about a material fact is genuine only if there is a sufficient evidentiary

basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248-49.  When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249.  The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322.  "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Celotex,* 477 U.S. at 323).  "[S]ummary judgment is essentially 'put

up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

### 2. Discussion.

The defendants contend that the statute of limitations bars Coviello's state-law claims because the book was published in October of 2013, but Coviello did not file this action until September of 2015,[3] more than a year after publication. The statute of limitations is an affirmative defense and the burden of establishing its applicability rests with the defendants. *Bradford-White Corp. v. Ernst & Whinney*, 872 F.2d 1153, 1161 (3d Cir. 1989).

### a. The Statute of Limitations Starts With the First Publication of the Book in Pennsylvania.

The parties agree that Pennsylvania law applies in this case.  A one-year statute of limitations is applicable to defamation and privacy actions in Pennsylvania. *See* 42 Pa.C.S.A. § 5523(1) ("The following actions and proceedings

---

[3]  Although the complaint was not filed until September 17, 2015, the complaint is dated September 14, 2015.  Giving Coviello the benefit the prisoner-mailbox rule, which provides that a document is deemed filed on the date it is given to prison officials for mailing," *Pabon v. Mahanoy*, 654 F.3d 385, 391 (3d Cir. 2011), we will use September 14, 2015, as the date this case was filed.

must be commenced within one year:  (1) An action for libel, slander or invasion

of privacy.").  A claim for defamation accrues upon publication of the allegedly

defamatory statement. *See Graham v. Today's Spirit,* 468 A.2d 454, 456 (Pa.

1983).  "To avoid the potential for endless re-triggering of the statute of

limitations, Pennsylvania has adopted the 'single publication rule,' which holds

that for purposes of the statute of limitations 'any one edition of a book or

newspaper, or any one radio, television broadcast, exhibition of a motion picture or

similar aggregate communication is a single publication.'" *In re Philadelphia*

*Newspapers, LLC*, 690 F.3d 161, 174 (3d Cir. 2012) (quoting *Graham,* 468 A.2d at

457 (quoting *Restatement (Second) of Torts* §577(A)(3) and citing 42 Pa.

Cons.Stat. § 8341(b)).  "Under this rule, 'it is the original printing of the

defamatory material and not the circulation of it which results in a cause of

action.'" *Id.* (quoting *Graham*, 468 A.2d at 457).  The rule "advances the statute of

limitations' policy of ensuring that defamation suits are brought within a specific

time after the initial publication." *Id*. at 175.  "In a defamation action arising from

the publication of a book, the statute of limitations begins as of the first date on

which a book becomes available for sale in the Commonwealth." 2 Standard

Pennsylvania Practice 2d § 13:154.[4]

---

[4]  In an early case, interpreting the single publication statute, the Pennsylvania
Supreme Court found "that neither the wording of the statute [n]or the policy
behind it requires a holding that the period of limitations begins to run from the

Here, the defendants have presented evidence that the book was published in October of 2013, which is more than a year before Coviello commenced this action. Coviello has not presented evidence to draw that date of publication in dispute. Thus, absent tolling, the statute of limitations bars Coviello's defamation claims.

> **b.  Since the Gravamen of All of Coviello's State-Law Claims Is the Publication of the Book, the One-Year Defamation Statute of Limitations Applies to All of the State-Law Claims.**

The defendants contend that Coviello's other state-law claims are barred by the one-year statute of limitation applicable to defamation claims because the gravamen of those claims is the publication of the book, and when the gravamen of

---

time of the first publication." *Dominiak v. Nat'l Enquirer*, 266 A.2d 626, 629 (Pa. 1970). Rather, the court stated that "the plaintiff may choose any publication as the single publication which represents his single cause of action." In a later case, however, the Pennsylvania Supreme Court commented that "it is the original printing of the defamatory material and not the circulation of it which results in a cause of action." *Graham*, 468 A.2d at 457. And courts have concluded that the statute of limitations runs from the date of first publication in Pennsylvania. *See Andrews v. Time, Inc.*, 690 F. Supp. 362, 366 (E.D. Pa. 1988) (construing *Dominiak* to stand "for the proposition that the date of first *statewide* publication, rather than of first nationwide publication, should trigger the statute of limitations"); *Bradford v. Am. Media Operations, Inc.*, 882 F. Supp. 1508, 1517 (E.D. Pa. 1995) ("Interpreting *Dominiak* in the light of *Graham*," to conclude that the plaintiffs "may select any time within which the *Star* became available in Pennsylvania on which to base their defamation and invasion of privacy" claims, but explaining that "[a]ccrual of a cause of action must . . . rest on the readily-ascertainable delivery dates, not on the conjectures and fortuity of later 'circulation' which would make the statute of limitations 'meaningless'") (quoting *Graham*, 468 A.2d at 457).

a claim is publication of defamatory statements, under Pennsylvania law, the one-year defamation statute of limitations applies regardless of how the plaintiff has labeled his claim. *See Evans v. Philadelphia Newspapers, Inc.*, 601 A.3d 330, 334-335 (1991) (holding that because the plaintiff's "claim for tortious interference is based upon the alleged false and defamatory character of the communication complained of, and it is indistinguishable from the claims of libel and slander, the same one year limitation period should apply to both"); *see also McClenaghan v. Turi*, 567 F. App'x 150, 156 (3d Cir. 2014) ("Looking to the gravamen of the action brought by Appellants, we agree with the District Court below that the one-year statute of limitations for defamation actions governs all of Appellants' claims. Because Appellants' "claim[s] for tortious interference [are] based upon the alleged false and defamatory character of the communication complained of," Appellants cannot circumvent the defamation statute of limitations by repackaging the same claims under a tortious interference theory.") (quoting *Evans*, 601 A.2d at 334); *Ghrist v. CBS Broad., Inc.*, 40 F. Supp. 3d 623, 630 (W.D. Pa. 2014) (concluding that the one-year statute of limitations applicable to plaintiff's defamation and invasion of privacy claims also barred plaintiff's intentional infliction of emotional distress claim because that claim was based on the same publication underlying the defamation claim); *Wolk v. Olson*, 730 F. Supp. 2d 376, 377 n.1 (E.D. Pa. 2010) ("Because the plaintiff's claim for intentional interference

27

with a potential contractual relationship arises from his defamation claim, the one-year statute of limitations applies to the contract claim, even though it would otherwise be subject to a two-year limitations period.").

Here the gravamen of all of Coviello's state-law claims is the publication of the book.  Thus, the one-year defamation statute of limitations applies to all of Coviello's state-law claims.  Therefore, absent tolling, the statute of limitations bars all of Coviello's state law claims.

### c.  The Discovery Rule is Not Applicable to a Mass-Media Defamation Case.

Coviello argues that he did not discover the book until September of 2015, and, thus, in accordance with the discovery rule, the statute of limitations does not bar his state-law claims.  "Pennsylvania law recognizes that 'in some circumstances, although the right to institute suit may arise, a party may not, despite the exercise of diligence, reasonably discover that he has been injured.'" *Haugh v. Allstate Ins. Co.,* 322 F.3d 227, 231 (3d Cir. 2003) (quoting *Crouse v. Cyclops Industries,* 745 A.2d 606, 611 (Pa. 2000)).  Under Pennsylvania law, the discovery rule may toll the statute of limitations. *Mest v. Cabot Corp.,* 449 F.3d 502, 510 (3d Cir. 2006).  "The discovery rule tolls the accrual of the statute of limitations when a plaintiff is unable, *"despite the exercise of due diligence,* to know of the injury or its cause." *Id.* (emphasis in original) (quoting *Pocono Int'l*

28

*Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983)).  "Under the rule, even if a plaintiff suffers an injury, the statute of limitations does not begin to run until 'the plaintiff knows, or reasonably should know, (1) that he has been injured, and (2) that his injury has been caused by another party's conduct.'" *Id.* (quoting *Debiec v. Cabot Corp.,* 352 F.3d 117, 129 (3d Cir. 2003)).

Although the discovery rule applies in some defamation cases where the defamatory statements are published in a format that the plaintiff is not likely to discover, *see e.g. Gallucci v. Phillips & Jacobs, Inc.,* 614 A.2d 284 (Pa.Super.Ct. 1992) (alleged defamatory information provided by employer to FBI), when the defamatory statement is widely circulated such as in a book, magazine, or newspaper, i.e., it is published in the mass media, it is generally held that the discovery rule does not apply. *See Wolk,* 730 F.Supp.2d at 378-79.  The reason for this is because the discovery rule applies to "hard-to-discern injuries," but when a statement is published in the mass media, such as in a book that is offered for sale to the public, we assume that with reasonable diligence, a reasonable person could discover the statement. *Id*. at 378; *Barrett v. Catacombs Press*, 64 F.Supp.2d 440, 447 (E.D. Pa. 1999) (declining to apply the discovery rule to statements made in a book); *Bradford v. Am. Media Operations, Inc.*, 882 F. Supp. 1508, 1519 (E.D. Pa. 1995) (reasoning, in a case involving a weekly newspaper, that "Pennsylvania law has always premised discovery on the actions of a reasonable person," and "no

such person could be deemed unaware of a publication so widely distributed").

Further, applying the discovery rule in so-called mass-media cases would

undermine the single-publication rule and allow for indefinite tolling of the statute

of limitations. *See Shively v. Bozanich*, 31 Cal. 4th 1230, 1250 (2003) ("Indeed,

courts uniformly have *rejected* the application of the discovery rule to libels

published in books, magazines, and newspapers, pointing out that application of

the discovery rule would undermine the protection provided by the single-

publication rule.").

The Pennsylvania Supreme Court has not ruled on whether the discovery

rule applies to mass-media defamation claims. Thus, we must predict how that

court would rule if confronted with that question. *See Wolfe v. Allstate Prop. &

Cas. Ins. Co.*, 790 F.3d 487, 492 (3d Cir. 2015) ("In the absence of a controlling

decision by the Pennsylvania Supreme Court, we must predict how it would decide

the questions of law presented in this case."). In so predicting, "we must take into

consideration: (1) what that court has said in related areas; (2) the decisional law of

the state intermediate courts; (3) federal cases interpreting state law; and (4)

decisions from other jurisdictions that have discussed the issue." *Colliers Lanard

& Axilbund v. Lloyds of London*, 458 F.3d 231, 236 (3d Cir. 2006).

Like the Pennsylvania Supreme Court, neither the Pennsylvania Superior

Court nor the Third Circuit has decided whether, under Pennsylvania law, the

discovery rule applies in mass-media defamation cases.  But a number of district

courts in this Circuit have refused to apply the discovery rule in mass-media

defamation cases. *See e.g. Stein v. City of Philadelphia*, No. CIV.A. 13-4644, 2013

WL 6408384, at *7 (E.D. Pa. Dec. 5, 2013) (declining "to apply the discovery rule

to Plaintiff's mass-media defamation claims" involving alleged defamatory

statements made on Twitter and an online publication); *Wolk*, 730 F. Supp. 2d at

378-379 (holding, in a case involving statements published on a website, that the

Pennsylvania Supreme Court would not apply the discovery rule to toll the statute

of limitations in a mass-media defamation case); *Barrett,* 64 F. Supp. 2d at 447

(E.D. Pa. 1999) (declining to apply discovery rule to alleged defamatory

statements in a book); *Bradford*, 882 F. Supp. at 1520 (E.D. Pa. 1995) (predicting

that "the Pennsylvania Supreme Court would not apply a discovery rule to an

action premised upon a weekly newspaper with a circulation of over three

million"); *see also Cole v. Ferranti*, No. 4:10-CV-426, 2012 WL 2131188, at *3

(M.D. Pa. June 12, 2012) (in a case involving alleged defamatory statements in a

book, quoting *Wolk*, 730 F. Supp.2d at 378, for the proposition that the "discovery

rule is at 'odds with a cause of action based upon a defamatory statement

disseminated through a mass medium' " and stating that the plaintiff's argument in

favor of application of the discovery rule "ignores the trend in Pennsylvania's

federal district courts *not* to apply the discovery rule to mass-media defamation

31

actions"), *aff'd on other grounds,* 532 F. App'x 205, 206 (3d Cir. 2013) ("We do not decide whether Pennsylvania's discovery rule broadly operates in the context of mass-media defamation claims because we conclude that in this case Cole could not have been '*reasonably unaware* that an injury has been sustained' during the limitations period."). Those cases are in accord with the many other courts that decline to apply the discovery rule to mass-media defamation claims. *See Wolk*, 730 F. Supp. 2d at 379 (citing cases).[5]

In accord with those cases, we also predict that the Pennsylvania Supreme Court would not apply the discovery rule to mass-media cases. And the fact that Coviello is a prisoner does not change our prediction given that under Pennsylvania law, the statute of limitations is not tolled merely because the plaintiff is in prison. *See* 42 Pa. Cons. Stat. Ann. § 5533(a) ("Except as otherwise

---

[5] Coviello does cite one case where the discovery rule was applied in a mass-media case. *See Bailey v. Dell Pub. Co.*, 790 F. Supp. 101, 105 (W.D. Pa. 1992), aff'd, 983 F.2d 1049 (3d Cir. 1992) (Table). In *Bailey*, the district court concluded that the moving defendants were not entitled to summary judgment based on the statute of limitations as to a defamation claim based on a statement in a book because when the book "was offered for sale in Pennsylvania bookstores and when, through the exercise of reasonable diligence, plaintiff should have discovered the defamatory statements, constitute questions of fact." *Id*. at 105. The district court determined, however, that the defendants were entitled to summary judgment on the merits of the claim. *Id*. at 106. As to the discovery rule, the *Bailey* court cited the lower court decision in *Gallucci v. Phillips & Jacobs Inc.*, 13 Pa. D. & C.4th 413, 419 (Com. Pl. 1991), for the proposition that the discovery rule applies to defamation case, but it failed to consider whether a different result is warranted where the defamation appears in a book rather than a private communication, as in *Gallucci*. Thus, we do not find *Baily* persuasive.

provided by statute, insanity or imprisonment does not extend the time limited by this subchapter for the commencement of a matter."); *See also Schweihs v. Burdick*, 96 F.3d 917, 921 (7th Cir. 1996) (declining to apply the discovery rule in a prisoner's case based on statements in a book given that Illinois law did not provide for tolling because of incarceration).

Coviello suggests that there is no evidence that this case qualifies as a mass-media case because there is no evidence of how many copies of the book were sold. But the evidence shows that the book was widely publicized and was sold in retail stores nationwide and online, such as through Amazon.com. Further, there is evidence of public book signings, one of which drew approximately 200 people, and during that event, Birkbeck saw people purchasing the book, and he signed numerous copies of the book. Accordingly, we conclude that there is not a genuine factual dispute that the book qualifies this case as a mass-media case. Thus, the discovery rule does not save Coviello's claims from being barred by the statute of limitations.

### d.  The Fraudulent Concealment Doctrine Does Not Apply.

Other than the discovery rule, "[i]n Pennsylvania, judicial extensions of the statute of limitations are expressly forbidden absent fraud or its equivalent." *Poole v. Marks*, 441 F. App'x 854, 857 (3d Cir. 2011) (citing 42 Pa. Cons.Stat. Ann.

§ 5504(a) and *Aivazoglou v. Drever Furnaces,* 613 A.2d 595, 598 (Pa. Super. Ct. 1992)).  Coviello argues that under the doctrine of fraudulent concealment his claims are timely.

"Pennsylvania's fraudulent concealment doctrine tolls the statute of limitations where 'through fraud or concealment the defendant causes the plaintiff to relax vigilance or deviate from the right of inquiry.'" *Mest*, 449 F.3d at 516 (quoting *Ciccarelli v. Carey Canadian Mines, Ltd.,* 757 F.2d 548, 556 (3d Cir.1985)).  "The doctrine is based on a theory of estoppel, and provides that the defendant may not invoke the statute of limitations, if through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts." *Fine v. Checcio*, 870 A.2d 850, 860 (Pa. 2005).  "The doctrine does not require fraud in the strictest sense encompassing an intent to deceive, but rather, fraud in the broadest sense, which includes an unintentional deception." *Id*.  But "'[i]n order for fraudulent concealment to toll the statute of limitations, the defendant must have committed some affirmative independent act of concealment upon which the plaintiff justifiably relied.'" *Pulli v. Ustin*, 24 A.3d 421, 426 (Pa. Super. Ct. 2011) (quoting *Baselice v. Franciscan Friars Assumption BVM Province, Inc.*, 879 A.2d 270, 278 (Pa. Super. Ct. 2005)).

Here, although Coviello alleges that the defendants failed to consult with him before publishing the book and failed to inform him of the publication of the

book, he does not allege that the defendants committed any affirmative acts of concealment.  Accordingly, his contention that the doctrine of fraudulent concealment saves his claim from being barred by the statute of limitations is without merit.

In sum, the statute of limitations bars Coviello's state law claims.

## IV.  Recommendation.

Based on the foregoing, it is recommended that the defendants' motion (doc. 33) to dismiss or for summary judgment be granted.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive

further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 19th day of January, 2017.


_**S/Susan E. Schwab**_
Susan E. Schwab
Chief United States Magistrate Judge